12  805
48 1096

### STATE *v.* SLAVE KITTY.

The Act of March 9th, 1855, " to provide for the trial of slaves accused of capital crimes in the parish of Orleans," was not repealed by the Act of 19th March, 1857, "relative to slaves." The Acts are not upon the same " subject matter." The former is a local law providing a local tribunal for certain specified cases; the latter is a general law applicable to the State at large, and the rule is, that a general statute without negative words will not repeal the particular provisions of a former one, unless the two Acts are irreconcilably inconcistent.

The Act of 19th March, 1857, "relative to slaves," repeals all laws, so far as the offences of slaves, specially made such by statutes relative to slaves, alone, are concerned, for the former Act contains no clause saving pending prosecutions or providing for the punishment of persons who had committed crimes under the repealed laws.

The word " whoever" in the Act of 14th March, 1855, "relative to crimes and offences," as used in the first section thereof, comprehends slaves considered as persons, as well as free men. And slaves, in our law, when held to answer for offences, are treated as persons, and may be punished under the general laws relative to crimes and offences, as well as under special statutes framed exclusively for that class of our population.

It is too late to raise objections in the Supreme Court as to the time of calling the jury and the notice to the master of the slave where no such objections were made at the trial.

The voluntary statements of the prisoner before accusation received against her.

A PPEAL from the First District Court of New Orleans, *Hunt*, J. *E. W. Moïse*, Attorney General, for the State :

The judgment in this case is sought to be reversed on the ground, that the court erred in admitting the confessions of the prisoner, (Record, p. 8.) The bill of exceptions shows, that *Kitty* went to the witness and said, " I am *Kitty*, the slave of *Mr. Smelser ;* I have something to reveal to you about *Mr. Smelser's* death. He was a poisoned man." Up to this time the witness had not said a word to *Kitty.* She had sought him voluntarily—voluntarily stated to him, that *Smelser* had been poisoned—and that she had something to reveal about it. The determination to confess seems to have been upon her mind— and the interview desired by her with the witness appears to have been for the purpose of carrying out this determination. After calling a by-stander—the witness observed to· *Kitty* that " she must now tell me all about it, that it would be better for her to do so, that it would be better for her to tell the whole truth about the matter."

It would be difficult to exclude this confession, if judged by the standard of defendant's counsel, (pp. 6, 7,) as fairly considered, one would suppose that the advice given by the witness could not have induced her to criminate herself, had she not previously resolved to make a clean breast of it. But the rule of law, as will be presently shown, is now well settled, that the inducement that will exclude a confession *must be actually, or constructively held out by a person in authority.*.

For many years there appears to have been much difference of opinion among the English Judges, as to the admissibility of confessions made under inducement to private persons—but latterly the doctrine has been established as heretofore stated. In *Rex* v. *Dunn,* and *Rex* v. *Slaughter,* 4 C. &. P. 543, (cited by defendant's counsel,) Bousanquet, J., excluded confessions made after inducements by persons not in authority. So also did Parke and Littledale, JJ. in *Rex* v. *Kingston,* 4 C. & P., 387. So also did Gurny, B., in *Rex* v. *Walkly* and another, C. C. & P. 175, and Patteson, J., in *Rex* v. *Thomas,* C. C. & P. 353. Alderson, B., entertained strong objections to the admissibility of confessions under these circumstances, but said there were opinions which he was bound to respect opposed to his own: *Rex* v. *Pountney,* 7 C. & P., 302 ; and Parke, B., said, that there was a difference of opinion among the Judges on this subject, 7 C. & P. 796, *Rex* v. *Spencer.* This was in 1838. After this a conference seems to have taken place among the Judges, the result of which was announced by Patteson, J. in 1839. He said : " It is the opinion of the Judges that evidence of any confession is receivable unless there

STATE
*v.*
KITTY.

has been some inducement *held out by some person in authority.*" *Regina* v. *Sarah Taylor,* 8 C. & P., 733. This announcement of the opinion of the Judges seems to have rendered the subsequent decisions uniform. In *Regina* v. *Laugher,* 2 C. & K., 225, the confession was excluded because, though made to a person not in authority, yet it was made in the presence of a person in authority—a constable. In *Regina* v. *Garner,* 2 C. & K. 920, it was held: that "in order to exclude evidence of a prisoner's confession, it must appear affirmatively, that some inducement to confess was held out to him *by, or in the presence of, some one holding authority.*" These two last decisions were in 1846. Afterwards (1852) the subject was considered by the court of criminal appeal (established in 1848), Baron Parke said, "The cases on this subject have gone quite far enough, and ought not to be extended  *  *  * if the threat or inducement has been held out, actually, or constructively by a person in authority, it cannot be received, however slight the threat or inducement, and the prosecutor, magistrate, or constable is such a person, and the master or mistress *may* be. *If not held out by one in authority they are clearly admissible.*" *Regina* v. *Moore,* 12 E. L. & Eq. 506. *Regina* v. *Baldry* was also a case reserved. The same eminent Judge said: "By the law of England in order to render a confession admissible in evidence, it must be perfectly voluntary, and there is no doubt that any inducement in the nature of a promise, or of threat held out by a person in authority, vitiates a confession. The decisions to that effect have gone a long way. Whether it would not have been better to have left the whole to go to the jury, it is now too late to inquire, but I think there has been too much tenderness towards prisoners in this matter. I confess, I cannot look at the decisions without some shame, when I consider what objections have prevailed to prevent the reception of confession,—and I agree with the observation of Mr. Pitt Taylor, that the rule has been extended quite too far, and that justice and common sense have been sacrificed at the shrine of mercy." *Regina* v. *Sleeman,* 22 E. L. & Eq. 606.

The counsel for defendant cites Greenleaf, who differs with Mr. Jay only in this: the former considered that there was a difference of opinion among the Judges on the question in controversy—while the latter lays down the rule that is urged by the State. The first edition of Greenleaf was published in 1842. At the time the text on the subject of discussion was written by Mr. G., he probably, had not seen, as he does not cite, the opinion of the Judges as announced in 1839 by Patteson, J., in *Regina* v. *Sarah Taylor.* The subsequent cases cited in this brief were certainly unknown to him, as the earliest of them was not rendered until 1846. In the edition of 1852, Mr. G. publishes in full the opinion of the Court of Criminal Appeal in *Regina* v. *Moore.*

But if the rule which Mr Greenleaf considers the best, and which Baron Parke said "it would have been better to have held," be adopted by this Court—the result will be the same. Under that rule the inquiry would be: "*were the promises of the witness sufficient to overcome the mind of the prisoner?*"

Test the admissibility of the confession by this rule. Kitty was not under arrest—she was not suspected—it was not known that Smelser had died of any but natural causes. He had been publicly interred—there had been no coroner's inquest. Kitty of her own free will went to the witness—to whom she was a stranger—although he was not to her. She voluntarily told him that Smelser had been poisoned—when the witness—after calling a by-stander said to her "it would be better for her to tell the whole truth about the matter" —"it would be better for her to do so"—and these words, uttered under these circumstances, are to be construed into "*a promise sufficient to overcome the mind of the prisoner.*" With great respect, it is submitted that such a decision would belong to the class of those cases in which Baron Parke says "justice and common sense have been sacrificed at the shrine of mercy."

In reference to the case of the *Commonwealth* v. *Knapp,* cited on the other side, it is to be observed—that the rule as laid down was *not* as stated by the Court—at least the rule in England—whatever it may have been in Massachussetts—as it is clear that there was a difference of opinion among the English Judges. Indeed, Morton, J., said "he has doubted whether confessions, with the accompanying circumstances, ought not always to be received in evidence." And of the same opinion was the late Judge Preston. See *State* v. *Havelin,* 6 An., 168-9.

Morehouse was not a person in authority. The counsel for prisoner calls him the prosecutor—but for what reason does not appear.

As to Kitty's being handcuffed—see *State* v. *Nelson*, 3 A., 497.

*R. H. Browne*, for the prisoner and appellant:

The only question to be decided, is, whether the Judge *a quo* erred in permitting these confessions to go to the jury?

This is a case of extra-judicial confessions. The confessions were made to a person who became the prosecutor of the prisoner.

A confession must never be received in evidence, where the defendant has been influenced by *any* threat or promise. To say that it will be better for him if he will confess, or worse if he will not, is sufficient to exclude the declarations of the prisoner.—Starkie's Ev. The law cannot measure the force of the influence used, or decide upon its effect on the mind, and therefore excludes the declaration, if *any degree* of influence has been exerted.—2 Russell on Cr. 645, marg.; 2 Starkie's Ev. 49, marg.

If any inducement, by promise of favor or by threat, be held out to the prisoner, as by telling him he had better tell all he knew, or he had better tell where he got it, &c., his confession cannot be given in evidence against him. —1 Archb. Cr. Pr. and Pl. 125.

And where a threat or promise is thus used, it must appear to have been used by some person concerned in apprehending, examining or prosecuting the prisoner, *or by the person to whom the confession is made*, to have the effect of preventing such confession from being given in evidence.—1 Arch. Cr. Pr. and Pl. 128.

Its admissibility is made to depend on its being free from suspicion, that it was obtained by any threats of severity, or *promise of favor and every influence, even the minutest.*—*State* v. *Field* and *Webber*, Peck's Rep. 140; Phil. Ev. C. & H. notes, vol ii, No. 206, p. 236.

It was held in the case of the *Queen* v. *Garner*, (decided in 1848) that the language "it would be better for her to confess," when addressed by the mistress' physician, in presence of the mistress, to a servant girl, was an *inducement*, and the confession was excluded. 61 Eng. C. L. Rep. 920.

The same decision was affirmed by a full bench of the High Court of Criminal Appeals in England, as late as 1852, [*Regina* v. *Baldry*, 12 Eng. L. and E. Rep. 596], Lord Chief Baron Pollock, deciding that, "when the admonition to speak the truth had been coupled with any expression importing that it *would be better for him to do so*, the confession was not receivable, the objectionable words being, that '*it would be better to speak the truth*,' because that imported it would be better for him to say something."

Saying to a prisoner that "it would be better for him to confess," or words to that effect, has been repeatedly held to be such an *inducement* offered, as will exclude his confessions.—*State* v. *Nelson*, 3 An., 499. See also *Rex* v. *Walkley et als*, 6 Car. and P. 175.

It may be urged that Morehouse had no authority over the defendant at the time she made her statement, and hence her confessions were properly admitted in evidence.

Mr. Joy, on Confessions, maintains the unqualified proposition that "a confession is admissible in evidence, although an inducement is held out, if such an inducement is held out by a person not in authority over the prisoner." But our own accurate and learned writer on the Law of Evidence, Mr. Greenleaf, after examining the authorities cited by Mr. Joy, says: "Upon a deliberate revision of the point, I have concluded to leave it where the learned Judges have stated it to stand—as one on which they were divided in opinion." 1 Greenl. Ev. § 223, note 1.

In this country there is a growing unwillingness to rest convictions on confessions alone. The confessions of a party, it has been held in several States, not made in open court, or on examination before a magistrate, but to an individual, uncorroborated by circumstances, and without proof *aliunde* that a crime has been committed, will not justify a conviction.—*People* v. *Hennessy*, 15 Wend., 147; *State* v. *Field*, Peck's Rep., 148; *State* v. *Long*, 1 Hayw., 455.

"A confession, at least in a capital case, from the nature of the thing, is a very doubtful species of evidence, and to be received with great caution.—*State* v. *Long*, 1 Hayw., (N. Ca.) Rep., 455.

On referring to Wharton's Criminal Law, p. 260, note X, it will be seen that

most of the German States have adopted our own system : "a voluntary confession, says Mittermain, (2 Strafonfahren, 114), is not now to be made the basis of a prosecution; that the fact that such an accusation is an unsolicited confession, in consequence of its unnaturalness, must excite a doubt of the intelligence of the self-accuser, and it therefore becomes the duty of the Judge not to content himself with such a confession, but be more than doubly cautious in the exposition of the *res gestae, &c.*"

SPOFFORD, J. The slave *Kitty* was tried before the Judge of the First District Court of New Orleans and a jury of six slave holders, pursuant to the Act of March 9th, 1855, (Session Acts p. 37.) The accusation drawn up by the District Attorney contained two counts, one for administering poison to *Levi Smelser*, and the other for the murder of said *Smelser.*

The prisoner was found " guilty without capital punishment," and she was sentenced to hard labor in the penitentiary for life by the Judge of the First District Court of New Orleans on the 24th March, 1857.

She has appealed to this court.

It is suggested, that the tribunal which tried and sentenced her was without jurisdiction; that the Act of March 9th, 1855, "to provide for the trial of slaves accused of capital crimes in the parish of Orleans," was repealed by the Act of March 19th, 1857, " relative to slaves." Session Acts, 229.

These Acts are not upon the same "subject matter." The former is a local law providing a local tribunal for certain specified cases. The latter is a general law applicable to the State at large.

The rule upon this subject is well stated in the recent work of Mr. Sedgwick upon statutory and constitutional law, 123: " In regard to the mode in which laws may be repealed by subsequent legislation, it is laid down as a rule, that a general statute, without negative words, will not repeal the particular provisions of a former one, unless the two Acts are irreconcilably inconsistent: as, for instance, the statute 5 Eliz. C. 4, that *none shall use* a trade without being apprentice, did not take away the previous statute 4 and 5 Philip and Mary, C. 5, declaring that *no weaver* shall use, &c. The reason and philosophy of the rule is, that when the mind of the legislator has been turned to the details of a subject, and he has acted upon it, a subsequent statute in general terms, or treating the subject in a general manner and not expressly contradicting the original Act, shall not be· considered as intended to affect the more particular or positive previous provisions, unless it is absolutely necessary to give the latter Act such a construction, in order that its words shall have any meaning at all."

In the *Succession of Fletcher*, 12 An., 498, (a case quite analogous to the present; for, in that case, the last of the two Acts had the same repealing clause,) we held: that it is only where there is an obvious and necessary inconsistency between the two Acts, that the earlier statute must be considered as repealed by the latter.

We there decided, that a power given generally in sweeping terms, to the Auditor of Public Accounts to employ attorneys to recover money due the State from any cause whatever, was exclusive of the Supreme and District Courts of the city of New Orleans, so as to save a previous local statute directing the Attorney General to represent the State in such cases in the city of New Orleans.

The doctrine of that case should control the present.

For, in this case as in that, the two statutes may well stand together. In-

deed, both were originally passed at the same session of the General Assembly in 1855, as parts of one general system of revised statutes; but the Act of March 15th, 1855 (p. 377) "relative to slaves and free colored persons," having been declared unconstitutional by this court in the case of the *State* v. *Slave Harrison*, 11 An., 722, some parts of it, including the general provisions in question, relative to the trial of slaves, were reënacted without alteration in the Act of March 19th, 1857, "relative to slaves," in such a form as it was supposed would obviate the constitutional objection found against the former Act.

The local Act of March 9th, 1855, under which the prisoner was tried, is, therefore, held to be in force. It has also been objected, that the law of March 19th, 1857, "relative to slaves," which denounces certain offences of slaves and prescribes the punishment therefor, repeals all laws upon the same subject-matter, and, therefore, repeals all statutes in force at the time the prisoner was tried and convicted, relative to the crimes with which she stands charged. So far as the offences of slaves, specially made such by statutes relative to slaves alone, are concerned, this doctrine is correct, as was held by this court in various cases decided last summer at Monroe, Alexandria and Opelousas. For the Act of March 19th, 1857, contains no clause saving pending prosecutions, or providing for the punishment of persons who had committed crimes under the repealed laws. The first count in this accusation charging the prisoner with having administered poison to *Levi Smelser* could not now, therefore, sustain a judgment of conviction.

But the second count contains a formal charge of murder. And the Act of March 14th, 1855, "relative to crimes and offences," in its first section declares, that "*whoever* shall commit the crime of willful murder, on conviction thereof, shall suffer death." The word "whoever" comprehends slaves considered as persons, as well as free men. And slaves, in our law, when held to answer for offences, are treated as persons; and it has been decided, that they may be punished under the general laws relative to crimes and offences as well as under the special statutes framed exclusively for that class of our population. *State* v. *Dick*, 4 An. 183; *State* v. *Jerry*, ib., 191.

The count for murder would, therefore, support a verdict and judgment for that offence, charged to have been committed by the prisoner on the 7th May, 1855.

The objections as to the time of calling the jury and the want of proper notice to the master of the slave, should have been made in the tribunal before which the prisoner appeared, pleaded and submitted to a trial. She was there represented by counsel who interposed no objections of that kind, and it is too late to raise them here.

One question alone remains. It grows out of a bill of exceptions taken to the refusal of the Judge to instruct the jury to disregard certain confessions of the prisoner. The bill is in these words: "Be it remembered, that upon the trial of this cause, and upon the cross-examination of *Joseph Morehouse*, a witness for the prosecution, to prove the confessions of the accused, the witness said: "the accused came to my yard where my shop is, she said she came voluntarily, of her own accord; she said she came to me because she knew I was the friend of her master; she said that she had been hand-cuffed; she had the manacles on her hands; that she was afraid she was going to be carried out of the State to Texas. I did not know who *Kitty* was. She approached

102

STATE
*v.*
KITTY.

me just as *Mr. Hall* was leaving the gate ; she said, "I am *Kitty*, the slave of *Mr. Smelser ;* I have something to reveal to you about *Mr. Smelser's* death. He was a poisoned man." This startled me, and I immediately called *Mr. Hall* back. I, then, in the presence of *Mr. Hall*, said to her, that " she must now tell all about it, that it would be better for her to do so, that it would be better for her to tell the whole truth about the matter." Whereupon the counsel for the accused asked the court to instruct the jury to disregard the confessions of the accused, upon the ground, that they were inadmissible : the court refused, and the accused by her counsel tendered this bill of exceptions," &c., &c.

It would seem from this bill, that whatever confessions the prisoner made had already gone to the jury before any objections were taken ; and, that the matter of inducement having been drawn out in the cross-examination of the party to whom the confessions were made, the prisoner's counsel then asked the court to charge the jury to disregard all that they had heard from this witness tending to implicate her with the crime, upon the ground that her statements were not voluntary.

A statement to a party accused by a person in authority, that it would be better for him to confess, will vitiate a subsequent confession. 1 Greenleaf Ev. § 219 *et seq.*

But it must here be observed, that so far as we are informed by the bill of exceptions, no charge had been made against the prisoner, and no suspicion excited ; indeed, it would seem from the expression of the witness, that he was startled to hear that *Smelser* had been poisoned, that it was not supposed he had died other than a natural death. The prisoner sought the witness voluntarily and unaccused ; she volunteered the statement, that the deceased had been poisoned ; the subsequent remark of the witness, a person not in authority over her, that it would be better for her to tell the whole truth about the matter, did not point to a confession by *Kitty* of any complicity on her part with the poisoning ; she was not told to *confess ;* indeed, it does not appear, that she was led to think herself suspected ; how, then, can it be reasonably inferred that by the remark of the witness she was induced to criminate herself ? We think this combination of circumstances is sufficient to justify the refusal of the Judge to instruct the jury to disregard entirely the confessions of the accused. "Promises and threats by private persons," says Greanleaf, vol. 1 § 223, "may perhaps, be treated as mixed questions of law and fact ; the principle of law, that the confession must be voluntary, being strictly adhered to, and the question, whether the promises or threats of the private individuals who employed them were sufficient to overcome the mind of the prisoner, being left to the discretion of the Judge, under all the circumstances of the case." The case of the *State* v. *Jonas*, 6 An., 695, goes much further that this in favor of the admissibility of the confessions of slaves.

It is, therefore, ordered, that the judgment appealed from be affirmed, with costs.

BUCHANAN, J., concurring. The appellant was tried and convicted on the 14th March, 1857, five days previous to the passage of the Act of 1857, No. 232, relative to slaves ; which, by its 43 section, was in force from and after its passsage.

That statute can, therefore, have no operation upon this case.

I concur in the decree affirming the judgment of the District Court.

COLE, J., dissenting. I am of opinion that the law is repealed under which the special tribunal for the trial of the accused was formed. She was tried under Act No. 43, p. 37, Session Acts, 1855, being "an Act to provide for the trial of slaves accused of capital crimes in the parish of Orleans."

On the 19th of March, 1857, "an Act relative to slaves" was passed. Session Acts, 1857, p. 229.

An examination of this Act shows that it was intended for the whole State; it enacts the different crimes for which slaves may be prosecuted and punished, and declares the mode of prosecution and the constitution of the tribunal which is to have jurisdiction.

This Act appoints the place of execution of slaves, and the way they are previously to be appraised, and how the owner is to be paid the value of his slaves that are condemned.

It points out the nature of evidence that may be received, and the degrees of consanguinity within which a person shall not be a good juror for the trial of slaves.

In De Armes' case, 10 M. 172, Martin, J., says: "A statute is said to repeal a former one when it is contrary thereto in matter." Leges posteriores, priores contrarias abrogant.

The statute of 33 H. 8, 3, provided, that any person examined before the king's counsel, who confesses treason, shall be tried in the county where the king pleases, and it was held to be repealed by that of 2 Ph. and M., which directs that all trials for treason shall be according to the common law.

The reason is apparent, says Judge Martin, "for the latter statute directed that all trials for treason, which include those of persons mentioned in the statute of Hen. 8, should be in the course pointed out by the common law, and this was contrary to the provision of the statute of H. 8.

"A statute is also said to repeal a former one, where it enacts a thing inconsistent with it. So the statute of 1 Ed. 6, 2, which provided that 'process shall be in the king's name,' was held to be repealed by that of 1 and 2 Ph. and M. 2, which provides, that 'all ecclesiastical jurisdiction of bishops, &c., shall be in the same estate as to process, as it was in the time of H. 8.' 'For the two provisions were inconsistent.' "

In the same case of De Armas, Judge Martin says: "That old laws are abrogated and repealed by those which are posterior, only when the latter are couched in negative terms, or are so clearly repugnant to the former, as to imply a negative. Second, a particular law is not repealed by a subsequent general law, unless there be such repugnancy between them, that they cannot both be complied with under any circumstances."

If we apply these principles to the case at bar, it will appear that the Act of 1855, No. 43, under which the prisoner was tried, has been repealed:

The form and mode of trial of slaves under the Act of 1857, is materially different from that of 1855; the latter Act provides, "That such slaves as may be accused of capital crimes in the parish of Orleans, shall be tried by a tribunal composed of the Judge of the First District Court of New Orleans and six citizens, slaveholders in said parish, chosen and convoked by said Judge." The Act of 1857, provides, "That whenever it shall be necessary to try a slave accused of a capital offence, the Justice of the Peace before whom the complaint shall have been made, shall notify another Justice in the parish of the charges that have been preferred against such slave, and shall require such

Justice to attend at his office the day after the receipt of such notification, or as soon afterwards as practicable, for the purpose of chosing *ten* persons, owners of slaves, to assist at the trial of the accused."

It cannot be denied that the Act of 1857 is a general law for slaves in every part of the State, because it contains an enumeration of the crimes of slaves; of their mode of trial; of their appraisement when condemned; of the mode of being paid; of the number of jurors a slave accused of a capital crime has the right to challenge peremptorily; and provides, that no slave shall be entitled to his freedom, under the pretence that he has been, with or without the consent of his owner, in a country where slavery does not exist, or in any of the States where slavery is prohibited; that no slave shall be admitted as a witness either in civil or criminal matters, for or against a free person of color, except in case such free individual be charged with having raised or attempted to raise an insurrection among the slaves of the State, or adhering to them by giving them aid and comfort in any manner whatever.

It must also be admitted, that the Act of 1857 is inconsistent with that of 1855, so far as the mode of trial is concerned, and they are so repugnant to one another, that both cannot exist.

The Act of '55 gives the slave in capital trials only, the Judge and six jurors; the Act of '57, entitles them, in capital cases, to two Justices and ten jurors, of which one justice and nine jurors shall constitute a quorum.

The Act of '57 also contains some privileges, such as the number the slave is entitled to challenge without cause, and the exclusion of certain relations of the proprietor of the accused which are not in the Act of '55.

As I consider the Act of 1857 is a general law for slaves in the whole State, and as its provisions are inconsistent with and repugnant to the Act of '55, and as there is no repealing clause in the Act of 1857, of all laws or parts of laws conflicting with the provisions of this Act, and all laws on the same subject matter, I believe the Act of 1855 is repealed, and the judgment ought to be reversed.

MERRICK, C. J., dissenting. I am not able to concur in the decree in this case. I think with Mr. Justice Cole, that the Act approved the 9th of March, 1855, to provide for the trial of slaves accused of capital offences in the parish of Orleans is repealed.

That Act, by itself, is wholly inadequate for the trial of slaves, as has been shown by Mr. Justice Cole. It can only have effect when its provisions are aided by the general law on the subject of the trial of slaves. It is within the express provisions of the repealing clause of the Act approved 19th of March, 1857, and it is but reasonable to suppose it is also within the intendment of that Act; for it cannot have any effect without the aid of the very statute which declares its repeal.

But I think there is an objection to this prosecution, of a character still more grave. The law, in my opinion, punishing the offence, has been repealed. The repeal of a penal statute during the pendency of a criminal prosecution under it, has always been held to be fatal to the prosecution, even though the action might be pending on appeal. This well settled rule of law has been recognized by this court and enforced under this statute, as has been remarked in the opinion in this case just pronounced. See also *State* v. *Johnson*, 12 L. R. 547; Bishop's Criminal Law, sec. 103.

It is conceded that the offence charged in the first count of the information, viz., that of having administered poison to *Levi Smelzer*, is repealed, because, as I understand the argument, the offence is punished by the 5th section of the Act of 1857 in question, it being specially applicable to slaves, and the general statute on the subject of crimes makes no mention of an offence in precisely the same terms ; that of administering poison with an intent to commit the crime of murder, being alone punished by the Act relative to crimes and offences.

This concession makes it only necessary to consider the offence charged in the second count. The latter count charges that the prisoner at, &c., willfully, feloniously, and of her malice aforethought, did kill and murder one *Levi Smelzer*, contrary to the form of the statute, &c.

Now, I find that the first section of the Act of 1857, relative to slaves, is in these words :

" Be it enacted, &c., That any slave who shall commit the crime of murder, shall be punished with death."

If I concede that the Act of 1855, relative to crimes and offences, which declared in its first section that whoever shall commit the crime of murder shall suffer death, could be applied to slaves, I do but admit that there was a law or a part of a law on the *subject-matter*, of the punishment of a slave who should commit murder, in force on the 19th day of March, 1857. For if it be applied to the punishment of slaves in whole or in part, it embraces in its subject-matter the punishment of the crime of murder, when committed by slaves. Now, if I refer to the repealing clause of the Act approved that day, I find, in the most sweeping terms, it repeals all laws and parts of laws conflicting with the provisions of this Act, and all laws on the same subject-matter.

Again, if I read the first section of the Act relative to crimes in this way, every person, whether white, black or a slave, who shall commit the crime of willful murder, on conviction thereof, shall suffer death, I shall find that I have brought the same in conflict with the first section of the Act relative to slaves, which has provided for the punishment of the slave who should commit murder. The first section of the Act of 1855, relative to crimes and offences, is therefore repealed, so far as it affects slaves, both because it is on the same subject-matter and because it is in conflict with the Act of 1857.

If it be objected that the crime of murder is of that atrocious character that it cannot be supposed that the Legislature intended a general pardon and amnesty to all slaves under prosecution for such offence, I can only reply, that it is admitted that the Act in question operates the general pardon of the heinous offences committed by the same class of persons. Moreover, it is in conformity to the repealing clause of the Act of 1855 relative to slaves and free persons of color held unconstitutional, and the Act relative to dealing with slaves, also approved the 19th day of March, 1857, p. 183.

The rule of law on the subject of the effect of a general repeal of a penal statute is well known, and the repealing clause is explicit. It is sufficient, I think that *ita lex scripta est*.